**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

**RECEIVED CFTC**

Office of Proceedings
Proceedings Clerk
**11:43 am, Sep 29, 2016**

|  |  |
|---|---|
| In the Matter of: | ) |
| | ) |
| **Jon P. Ruggles,** | ) **CFTC Docket No. 16-34** |
| | ) |
| **Respondent.** | ) |
| | ) |

## ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS

### I.

The Commodity Futures Trading Commission ("Commission") has reason to believe that, from at least March 2012 through December 2012 (the "Relevant Period"), Jon P. Ruggles ("Ruggles" or "Respondent") violated Sections 4b(a)(1)(A) and (C), 4c(a), 4c(b), and 6(c)(1) of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§, 6b(a)(1)(A) & (C), 6c(a), 6c(b), & 9(1) (2012), and Commission Regulations ("Regulations") 1.38(a), 33.10(a) and (c), and 180.1(a) and (c), 17 C.F.R. §§ 1.38(a), 33.10(a) & (c), & 180.1(a) & (c) (2015). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondent engaged in the violations set forth herein, and to determine whether any order should be issued imposing remedial sanctions.

### II.

In anticipation of the institution of an administrative proceeding, Respondent has submitted an Offer of Settlement ("Offer") that the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Respondent consents to the entry of this Order Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order") and acknowledges service of this Order.[1]

---

[1] Respondent consents to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondent does not consent to the use of the Offer or the findings or conclusions in this Order consented to in the Offer, as the sole basis for any other proceeding brought by the Commission, other than a proceeding in bankruptcy or to enforce the terms of this Order. Nor does Respondent consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding.

Exhibit A

## III.

The Commission finds the following:

### A. SUMMARY

During the Relevant Period, Ruggles was responsible for developing his employer's fuel hedging strategies and for executing his employer's trades in crude oil futures and options, heating oil futures and options, and RBOB gasoline futures on the New York Mercantile Exchange ("NYMEX"), a division of CME Group. As an employee, and under his employer's policies governing employee conduct, Ruggles owed his employer a duty of trust and confidence to act in his employer's best interest and to keep confidential his employer's material, nonpublic information regarding its trading activity.

On at least 71 days between March 2012 and December 2012, Ruggles used material, nonpublic information regarding his trading on behalf of his employer to trade for his own personal benefit. On these days, Ruggles traded the same crude oil futures and options, heating oil futures and options, and RBOB gasoline futures that he traded for his employer in personal accounts in his wife's name, which he controlled. Ruggles sequenced his trading on these days in these personal accounts and his employer's accounts, all of which he controlled, so that the majority of the orders he placed in these personal accounts were executed against the orders he placed for his employer. The remaining orders in these personal accounts were filled by other market participants at the same limit-order prices. Altogether, these transactions generated at least $3,501,306 in ill-gotten trading profits.

By trading in this manner, Ruggles breached his duties to his employer and misappropriated his employer's material, nonpublic information for his own personal gain in violation of the Act and Regulations. In addition, by arranging his trading in both the personal accounts and his employer's accounts so that the orders he placed for the personal accounts were executed against the orders he placed for his employer, Ruggles negated market risk and avoided competitive execution. In so doing, Ruggles engaged in fictitious and noncompetitive trading in violation of the Act and Regulations.

### B. RESPONDENT

During the Relevant Period, Ruggles resided and worked in Atlanta, Georgia. Ruggles's work responsibilities included developing and implementing his employer's fuel hedging strategy, which included trading crude oil futures and options, heating oil futures and options, and RBOB gasoline futures on the NYMEX. He has never been registered with the Commission.

### C. FACTS

#### 1. Ruggles's Job

Ruggles began working for the employer at issue in 2011.[2]  Ruggles had broad discretion to develop and execute his employer's fuel hedging strategy, which included trading crude oil futures and options, heating oil futures and options, and RBOB gasoline futures on the NYMEX. Ruggles had the authority to place orders and execute trades on behalf of his employer in his employer's trading accounts.

In this role, Ruggles possessed material, nonpublic information regarding his employer's strategies and plans for trading futures and options.  This included information regarding the specific trades in crude oil futures and options, heating oil futures and options, and RBOB gasoline futures his employer planned to execute on the NYMEX, the order types his employer would use to execute these trades, when and/or at what prices his employer would place these orders, and the number of contracts his employer would seek to trade.

As an employee, Ruggles had a duty of trust and confidence to his employer and owed his employer a duty to act in the employer's best interests, keep confidential the employer's material, nonpublic information, and not misappropriate this information for his own financial or personal benefit.  Ruggles also owed a duty to the employer under its policies governing employee conduct to protect the employer's confidential and proprietary information and avoid using this information for his own personal benefit.

#### 2. Ruggles's Unlawful Trading

During the Relevant Period, Ruggles violated these duties and misappropriated his employer's material, nonpublic information.  Ruggles did so by using his knowledge of his employer's trading information and strategy to benefit his personal trading.  Specifically, Ruggles traded the same crude oil futures and options, heating oil futures and options, and RBOB gasoline futures that he traded for his employer in accounts in his wife's name that he had established and controlled, and he sequenced his trading in the personal and the employer's accounts so that the majority of the orders he placed in the personal accounts were executed against the orders he placed in his employer's accounts.  Any remaining orders in the personal accounts were filled by other market participants at the same prices as those filled by his employer's accounts.

The most common trading pattern Ruggles used involved opening a position in a futures or option contract he planned to trade on behalf of his employer in one of the personal accounts that he controlled.  Ruggles then placed limit orders in the personal account to offset this position at a profit, at prices not currently available in the market.  Because these limit orders were placed at prices away from the current market, these orders were not immediately filled.  Ruggles then placed orders in one of his employer's accounts for the same or a larger quantity of this contract on the opposite side of the market.  These orders for his employer were either immediately executed against the limit orders in Ruggles's personal account or were initially executed against

---

[2] This employer terminated Ruggles's services on December 19, 2012.

the current best offers or bids in the market before eventually being executed against the limit orders in Ruggles's personal account. The transactions between his employer's account and Ruggles's personal account typically offset all or most of the open positions in the personal account, generating trading profits. In some instances, a portion of Ruggles's personal limit orders was filled at his specified prices by other market participants, who placed orders at these prices after the personal limit orders began to be executed against his employer's orders. These transactions also generated trading profits for Ruggles.

Another trading pattern Ruggles used involved placing limit orders in one of the personal accounts he controlled to open a position in the same futures or options contract he planned to trade on behalf of his employer. In this pattern, Ruggles first placed limit orders to open a futures or options position in his personal accounts at advantageous prices not currently available in the market. These orders were not immediately filled. Ruggles then placed orders in one of his employer's accounts for the same contract on the opposite side of the market. The orders in his employer's account were either immediately executed against the limit orders in Ruggles's personal account or were initially executed against the current best offers or bids in the market before eventually being executed against the limit orders in Ruggles's personal account. In some instances, a portion of Ruggles's personal limit orders was filled at his specified prices by other market participants, who placed orders at these prices after the personal limit orders began to be executed against his employer's orders. Using his trading activity in his employer's accounts in this way, Ruggles was able to open positions in the personal accounts at better prices than were otherwise available in the market, and was later able to offset these positions at a profit.

At times during the Relevant Period, Ruggles used a combination of the two patterns described above: opening a position in one of his personal accounts by placing limit orders that were executed against orders he placed in one of his employer's accounts, and then offsetting this position at a profit by placing limit orders that were executed against additional orders he placed on behalf of his employer.

Ruggles knew that the orders he placed in his personal accounts would be executed against the orders he placed in his employer's accounts or, alternatively, would be executed against orders from other market participants at the price specified in those orders. By trading in this manner, Ruggles all but guaranteed that the orders he placed in his personal accounts to open and/or offset positions would be filled at advantageous prices. For those trades in his personal accounts that he executed against trades in his employer's accounts, Ruggles was able to avoid competitive execution and negate market risk.

Ruggles never disclosed to his employer that he planned to execute trades in his personal accounts using the material, nonpublic information he had obtained through his trading on its behalf. By executing these trades, Ruggles breached the duties that he owed to his employer and misappropriated the information for his own benefit.

Ruggles engaged in this conduct on 71 days during the Relevant Period and generated trading profits totaling at least $3,501,306 in the personal trading accounts he controlled. Ruggles engaged in this conduct with respect to futures on 63 of these days, with respect to options on 11 of these days, and with respect to both futures and options on 3 of these days.

4

# IV.

## LEGAL DISCUSSION

**A.**     **Section 6(c)(1) and Regulation 180.1: Employment of a Manipulative or Deceptive Device—Misappropriation of Material, NonPublic Information**

Section 6(c)(1) of the Act makes it unlawful for any person, in connection with any contract of sale of any commodity for future delivery, to use or employ any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission shall promulgate.  Pursuant to this authority, the Commission promulgated Regulation 180.1, which, with respect to conduct on or after August 15, 2011, makes it unlawful to: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.[3]

As the Commission has noted, "Section 6(c)(1) and final Rule 180.1 augment the Commission's existing authority to prohibit fraud and manipulation." *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation,* 76 Fed. Reg. 41,398, 41,401 (July 14, 2011).  In its Notice of Proposed Rulemaking for Regulation 180.1, the Commission made clear that its intent was "to interpret CEA section 6(c)(1) as a broad, catch-all provision reaching fraud in all its forms—that is, intentional or reckless conduct that deceives or defrauds market participants." *Prohibition of Market Manipulation,* 75 Fed. Reg. 67,657, 67,658 (CFTC Nov. 3, 2010).  Put otherwise, the Commission has stated its intent to interpret the "in connection with" requirement "broadly, not technically or restrictively." 76 Fed. Reg. 41,405.  Accordingly, "Section 6(c)(1) and final Rule 180.1 reach all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, pendency, or termination of any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." *Id.*

---

[3] "The language of CEA section 6(c)(1), particularly the operative phrase 'manipulative or deceptive device or contrivance,' is virtually identical to the language used in section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")." 76 Fed. Reg. at 41,399.  Indeed, when the Commission promulgated Rule 180.1, the Commission observed that "[g]iven the similarities between CEA section 6(c)(1) and Exchange Act section 10(b), the Commission deems it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b-5." *Id.* Accordingly, case law developed under Section 10(b) of the Exchange Act and SEC Rule 10b-5 is instructive in construing CEA Section 6(c)(1) and Commission Regulation 180.1(a).  The Commission explained, however, that because of "the differences between the securities markets and the derivatives markets, the Commission will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5." 76 Fed. Reg. at 41,399.

Trading on material, nonpublic information in breach of a pre-existing duty may violate Regulation 180.1. As the Commission has expressly stated, "[d]epending on the facts and circumstances, a person who engages in deceptive or manipulative conduct in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, *for example by trading on the basis of material nonpublic information in breach of a pre-existing duty* (established by another law or rule, or agreement, understanding, or some other source), *or by trading on the basis of material nonpublic information that was obtained through fraud or deception*, may be in violation of final Rule 180.1." 41 Fed. Reg. 41,398, 41,403 (emphasis added). *See, e.g.*, *In re Arya Motazedi*, Comm. Fut. L Rep. (CCH) ¶ 33,599 (Dec. 2, 2015) (finding that trader violated Regulation 180.1 by using employer's trading information to trade for his own benefit); *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (holding that a person violates SEC Rule 10b-5 by misappropriating confidential information for securities trading purposes in breach of a duty owed to the source of the information). The undisclosed trading on the basis of material, nonpublic information in breach of a duty defrauds the source of the exclusive use of the information. *Motazedi*, Comm. Fut. L Rep. (CCH) ¶ 33,599 at 78,304 (citing *O'Hagan*, 521 U.S. at 652); *see O'Hagan,* 521 U.S. at 652 ("Under th[e] misappropriation theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information.").[4] Such trading deceives not only the source of the information but harms the integrity of the markets and the investing public. *O'Hagan,* 521 U.S. at 652–53, 658.

Although Section 6(c)(1) of the Act is silent with respect to scienter, the Commission has stated that "recklessness is, at a minimum, necessary to prove the scienter element of final Rule 180.1." 76 Fed. Reg. at 41,404. Accordingly, Regulation 180.1 sets out the required scienter as "intentionally or recklessly."[5]

On 71 days during the Relevant Period, by trading futures and options in the manner described above, Ruggles intentionally or recklessly breached the duties he owed to his employer as an employee and under his employer's policies governing employee conduct and thereby misappropriated his employer's material, nonpublic information for his own benefit in violation of both Section 6(c)(1) of the Act and Rule 180.1.

---

[4] As the Supreme Court observed in *O'Hagan*, "misappropriators . . . deal in deception. A fiduciary who '[pretends] loyalty to the principal while secretly converting the principal's information for personal gain' 'dupes' or defrauds the principal. The undisclosed misappropriation of such information, in violation of a fiduciary duty, . . . constitutes fraud akin to embezzlement." 521 U.S. at 653–54. Consequently, the Court held that "misappropriation, as just defined, satisfies [the Securities Exchange Act of 1934] § 10(b)'s requirement that chargeable conduct involve a "deceptive device or contrivance" used "in connection with" the purchase or sale of securities. *Id.* at 653.

[5] Long-standing precedent defines "recklessness" as an act or omission showing "an extreme departure from the standards of ordinary care" that it is very difficult to believe the actor was not aware of what he or she was doing. *CFTC v. Kraft Foods Group, Inc.*, Case No. 15-cv-2881, 2015 WL 9259885 at *12 (N.D. Ill. Dec. 18, 2015); *Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1998).

**B.**     <u>Section 4b(a)(1)(A) and (C): Fraud in Connection with Futures</u>

Section 4b(a)(1)(A) and (C) makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, on or subject to the rules of a designated contract market, for or on behalf of any other person to cheat or defraud or attempt to cheat or defraud such other person or willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act or agency performed with respect to such order or contract for such person.

The misappropriation of confidential trading information by someone who owes a duty of trust and confidence to the source of that information, such as an employee's misappropriation of information belonging to his employer by using such information to trade for his own personal benefit, constitutes fraud under 4b(a). *See In re Sitzmann*, CFTC Docket No. 96-5, 1997 WL 82610 (Feb. 26, 1997) (finding that vice president of commodity trading of meat processer traded for his own benefit in a proprietary trading account on the basis of his employer's nonpublic and proprietary information about large orders in violation of 4b(a)).

Scienter under Section 4b(a) of the Act is established if the respondent intended to defraud, manipulate, or deceive, or if respondent's conduct represents an extreme departure from the standards of ordinary care." *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002). Scienter requires proof that a defendant committed the alleged wrongful acts intentionally or with reckless disregard for his duties under the Act. *See CFTC v. Noble Metals Int'l Inc.*, 67 F.3d 766, 774 (9th Cir. 1995); *see also Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Circ. 1988) (holding that recklessness is sufficient to satisfy scienter requirement). The Commission need only demonstrate that a respondent's actions were "intentional as opposed to accidental." *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985).

On 63 days during the Relevant Period, by trading futures in the manner described above, Ruggles knowingly or recklessly breached the duties he owed to his employer as an employee and under his employer's policies governing employee conduct and thereby misappropriated his employer's material, nonpublic information for his own benefit in violation of Section 4b(a)(1)(A) and (C) of the Act.

**C.**     <u>Section 4c(b) and Regulation 33.10(a) and (c): Fraud in Connection with Options</u>

Section 4c(b) of the Act prohibits entering into any option transaction involving any commodity regulated under the Act "contrary to any rule regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe." Regulation 33.10(a) and (c) makes it unlawful for any person "(a) [t]o cheat or defraud or attempt to cheat or defraud any other person" and "(c) [t]o deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction." Conduct that violates Section 4b(a) of the

Act also violates Section 4c(b) and Regulation 33.10. *See, e.g., CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 445 (D.N.J. 2000) (analyzing Section 4b(a) and Section 4c(b) claims together).

On 11 days during the Relevant Period, by trading options in the manner described above, Ruggles knowingly or recklessly breached the duties he owed to his employer as an employee and under his employer's policies governing employee conduct and thereby misappropriated his employer's material, nonpublic information for his own benefit in violation of Section 4c(b) of the Act and Regulation 33.10(a) and (c).

**D.    Section 4c(a): Fictitious Sales**

Section 4c(a) of the Act makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of a transaction involving futures or options that is a fictitious sale. *In re Gimbel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24, 213 at 35, 003 (Apr. 14, 1988), *aff'd as to liability*, 872 F.2d 196 (7th Cir. 1989) (finding lumber trades prearranged as to contract, price, and quantity to be unlawful fictitious sales). "By enacting Section 4c(a), Congress sought to ensure that all trades are focused in the centralized marketplace to participate in the competitive determination of the price of the futures contracts." *In re Thomas Collins*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,194 at 45,742 (Dec. 10, 1997), *quoting* S.Rep. No. 93-1131, 93d Cong., 2d Sess. 16-17 (1974);

The Act does not define what is a "fictitious sale"; instead, Section 4c(a) broadly prohibits trades "that give the appearance of submitting trades to the open market while negating the risk or price competition incident to such a market." *In re FirstRand Bank, Ltd.*, Comm. Fut. L. Rep. (CCH) ¶ 33,233 (Aug. 27, 2014) (quoting *In re Harold Collins*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,982 at 31,903 (Apr. 4, 1986), *rev'd on other grounds sub nom. Stoller v. CFTC*, 834 F.2d 262 (2nd 1987)); *In re Fisher*, [2003-2004 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 29,725 at 56,052 n.11 (Mar. 24, 2004). Intent must be proven to establish a violation of Section 4c(a) of the Act. *Reddy v. CFTC*, 191 F.3d 109, 119 (2d Cir. 1999).

Here, Ruggles placed futures and options orders in personal accounts he controlled knowing that these orders would be matched in substantial part (if not entirely) against orders he was placing for his employer on the opposite side of the market for the same futures or options contract. For the trades in his personal accounts that he executed against trades in his employer's accounts, Ruggles was able to avoid competitive execution, negate market risk, and all but guarantee that these trades would be executed at the prices he sought. Accordingly, these trades constitute fictitious sales in violation of Section 4c(a) of the Act.

**E.    Regulation 1.38(a): Noncompetitive Trades**

Regulation 1.38(a) requires that all purchases and sales of commodity futures and options be executed "openly and competitively." The purpose of this requirement is to ensure that all trades are directed into a centralized marketplace to participate in the competitive determination of the price of futures and options contracts.

8

Noncompetitive trades are generally transacted in accordance with expressed or implied agreements or understandings between and among the traders. *In re Gilchrist*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,993 at 37,652 (Jan. 25, 1991) (concerning intentional arrangement of series of transactions in gold pit). Engaging in fictitious trading is a form of noncompetitive trading that violates Regulation 1.38(a). *Gimbel*, ¶ 24,213 at 35,003. Scienter is a necessary element of Regulation 1.38, and the Commission must establish that respondent's participation in the noncompetitive execution of futures trades was "knowing." *See e.g.*, *In re Buckwalter*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,995 at 37,685 (Jan. 25, 1991); *In re Bear Stearns & Co.*, ¶ 24,994 at 37,666; *In re Gilchrist*, ¶ 24,993 at 37,653 n.26.

Here, Ruggles placed futures and options orders in personal accounts he controlled knowing that these orders would be matched in substantial part (if not entirely) against orders he was placing for his employer on the opposite side of the market for the same futures or options contract. For the trades in his personal accounts that he executed against trades in his employer's accounts, Ruggles was able to create the appearance of submitting trades to the open market while in fact avoiding competitive execution and negating any risk that he would not execute the trade at the price that he sought. By trading arranging trades between two trading accounts that he controlled, Ruggles engaged in noncompetitive transactions that violate Regulation 1.38(a).

## V.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that, during the Relevant Period, Ruggles violated Sections 4b(a)(1)(A) and (C), 4c(a), 4c(b), and 6(c)(1) of the Act and Regulations 1.38(a), 33.10(a) and (c), and 180.1(a) and (c).

## VI.

## OFFER OF SETTLEMENT

Respondent has submitted an Offer in which he, without admitting or denying the findings and conclusions herein:

A. Acknowledges receipt of service of this Order;

B. Admits the jurisdiction of the Commission to all the matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C. Waives:

    (1) the filing and service of a complaint and notice of hearing;

    (2) a hearing;

    (3) all post-hearing procedures;

    (4)  judicial review by any court;

    (5)  any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

    (6)  any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. §§ 148.1-30 (2015), relating to, or arising from, this proceeding;

    (7)  any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-68 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

    (8)  any claims of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.  Stipulates that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondent has consented in the Offer; and

E.  Consents, solely on the basis of the Offer, to the Commission's entry of this Order that:

    (1)  makes findings by the Commission that Respondent violated Sections 4b(a)(1)(A) and (C), 4c(a), 4c(b), and 6(c)(1) of the Act and Regulations 1.38(a), 33.10(a) and (c), and 180.1(a) and (c);

    (2)  orders Respondent to cease and desist from violating Sections 4b(a)(1)(A) and (C), 4c(a), 4c(b), and 6(c)(1) of the Act and Regulations 1.38(a), 33.10(a) and (c), and 180.1(a) and (c);

    (3)  orders Respondent to pay a civil monetary penalty in the amount of one million, seven hundred and fifty dollars ($1,750,000), plus post-judgment interest, according to the terms set forth below;

    (4)  orders that Respondent be permanently prohibited from, directly or indirectly, engaging in trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. §1a(4) (2012)), and all registered entities shall refuse him trading privileges; and

    (5)  orders Respondent to comply with the conditions, undertakings, and representations consented to in the Offer and set forth in Part VII of this Order, including the undertaking that Respondent pay disgorgement in the amount of three million, five hundred and one thousand, three hundred and six dollars ($3,501,306), plus post-judgment interest, according to the terms set forth below.

Upon consideration, the Commission has determined to accept the Offer.

## VII.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A. Respondent shall cease and desist from violating Sections 4b(a)(1)(A) and (C), 4c(a), 4c(b), and 6(c)(1) of the Act and Regulations 1.38(a), 33.10(a) and (c), and 180.1(a) and (c));

B. Respondent shall pay a civil monetary penalty in the amount of one million, seven hundred and fifty thousand dollars ($1,750,000) (the "CMP Obligation"), plus post-judgment interest. Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined using the Treasury Bill rate prevailing on the date of entry of the Order pursuant to 28 U.S.C. § 1961 (2012)

Respondent shall satisfy the Disgorgement Obligation (as defined below in Section VII. D. 3.) and the CMP Obligation by making payments as follows:

(1) $1,051,261 to be paid on the date of entry of this Order;

(2) $650,000, plus post-judgment interest, to be paid within 6 months of the date of entry of this Order;

(3) Five payments of $600,000 each, plus post-judgment interest, to be paid within 12, 18, 24, 30, and 36 months of the date of entry of this Order, respectively; and

(4) A final payment of $550,045, pus post-judgment interest, to be paid within 42 months of the date of entry of this Order.

Payments shall be deemed made on the date they are received by the Commission. Payments received by the Commission shall be credited first against the Disgorgement Obligation, plus post-judgment interest. When the Disgorgement Obligation, plus post-judgment interest, is fully satisfied, then payments received by the Commission shall be credited against the CMP Obligation, plus post-judgment interest. If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of the Disgorgement Obligation and the CMP Obligation, plus any additional post-judgment interest, shall be due and payable immediately, without further application.

Respondent shall make each payment towards satisfaction of the Disgorgement Obligation and the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, Respondent shall make the payment payable to the Commodity Futures Trading Commission, and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables
> DOT/FAA/MMAC/AMZ-341
> CFTC/CPSC/SEC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> (405) 954-7262 office
> (405) 954-1620 fax
> nikki.gibson@faa.gov

If payment is to be made by electronic transfer, Respondent shall contact Nikki Gibson or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondent shall accompany payment of the Disgorgement Obligation and CMP Obligation with a cover letter that identifies Respondent and the name and docket number of this proceeding. Respondent shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C. Respondent is permanently prohibited from, directly or indirectly, engaging in trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012)), and all registered entities shall refuse him trading privileges; and

D. Respondent shall comply with the following conditions and undertakings set forth in the Offer:

1. Public Statements: Respondent agrees that neither he nor any of his successors, assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order, or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondent's (i) testimonial obligations or (ii) right to take legal positions in other proceedings to which the Commission is not a party.

2. Respondent agrees that he shall never, directly or indirectly:

   a. trade on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

    b.  enter into any transactions involving "commodity interests (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2015)), for Respondent's own personal account or for any account in which Respondent has a direct or indirect interest;

    c.  have any commodity interests traded on Respondent's behalf;

    d.  control or direct the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    e.  solicit, receive, or accept any funds from any person for the purpose of purchasing or selling any commodity interests;

    f.  apply for registration or claim exemption from registration with the Commission in any capacity, and engage in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2015); and/or

    g.  act as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2015)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)) registered, required to be registered, or exempted from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2015).

3.  <u>Disgorgement:</u>  Respondent agrees to pay disgorgement in the amount of three million, five hundred and one thousand, three hundred and six dollars ($3,501,306) (the "Disgorgement Obligation"), plus post-judgment interest.  The Disgorgement Obligation represents the ill-gotten trading profits Ruggles generated through the scheme described above.  Post-judgment interest shall accrue on the Disgorgement Obligation beginning on the date of entry of this Order and shall be determined using the Treasury Bill rate prevailing on the date of entry of the Order pursuant to 28 U.S.C. § 1961 (2012).

4.  <u>Partial Satisfaction</u>: Respondent understands and agrees that any acceptance by the Commission of any partial payment of Respondent's Disgorgement Obligation or CMP Obligation shall not be deemed a waiver of his obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

5.  <u>Change of Address/Phone</u>: Until such time as Respondent satisfies in full the Disgorgement Obligation and CMP Obligation as set forth in this Order, Respondent shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

**The provisions of this Order shall be effective on this date.**

By the Commission

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: September 29, 2016

14